UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ANTHONY BARRETT,<br><br>    Plaintiff,<br><br> v.<br><br>G. BERRY, et al.,<br><br>    Defendants. | Case No. 19-cv-01923-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 35, 45 |

## I. INTRODUCTION

Plaintiff brings a *pro se* action under 42 U.S.C. § 1983 alleging that on February 6, 2017, his Eighth Amendment rights were violated by San Quentin State Prison ("SQSP") officers J. Dougery, M. Gaitan, J. Castro, S. Giminez, A. Strayhorn and J. King when they failed to intervene when defendant G. Berry sprayed him with pepper spray, which constituted excessive force. He also alleges that these defendants were deliberately indifferent to his serious medical needs by failing to promptly decontaminate him from the pepper spray. He alleges that defendant Dr. Berger used excessive force by giving him a forcible injection. Now pending before the Court is defendants' motion for summary judgment. Plaintiff filed an opposition and defendants filed a reply. Defendants move for summary judgment on the following grounds: (1) plaintiff failed to exhaust administrative remedies; (2) plaintiff's complaint was untimely; (3) the undisputed facts show there was no excessive force or improper medical care; and (4) defendants are entitled to qualified immunity. Docket. No. 35. For the reasons set forth below, defendants' motion for summary judgment is granted in part and denied in part.

## II. BACKGROUND

The following facts are undisputed unless otherwise noted:

### A. Cell Extraction

At all relevant times plaintiff was housed at SQSP. Complaint at 1. Defendants Berry, King, Giminez, Gaitan, Dougery, Castro and Strayhorn were correctional officers at SQSP at the relevant time. *Id*. at 2. Defendant Berger was a staff psychiatrist at the relevant time. *Id*.

Plaintiff was a patient at the prison's Psychiatric Inpatient Program ("PIP") which provides a heightened level of mental health care to condemned inmates. *Id*. at 5; Motion for Summary Judgment ("MSJ"), Berger Decl. ¶ 3. Due to the ongoing danger that plaintiff presented to himself, a July 19, 2016, court order authorized prison officials to involuntary administer psychotropic medication to plaintiff. Request for Judicial Notice, Ex. A; Berger Decl. ¶ 4.[1] The court order expired on July 19, 2017. *Id*.

On the evening of February 6, 2017, plaintiff attempted to commit suicide by cutting both of his arms, after which medical staff sutured his wounds. Berger Decl. ¶ 5; Complaint at 5. Defendant Berger, who was the on-call psychiatrist and at home at the time, ordered plaintiff to be put on suicide watch. Berger Decl. ¶ 6. An inmate on suicide watch is required to wear a safety smock to prevent further self-harm, but plaintiff refused to wear the smock. *Id*. ¶¶ 6-7. As a result, plaintiff was placed back in his cell with his clothing. *Id*. ¶ 7. Due to plaintiff's history of self-harm, he was at risk in his cell with his clothing, which can be used to hang or suffocate oneself. *Id*. ¶¶ 6-7. Berger arrived at the prison and reiterated that plaintiff needed to be placed on suicide watch and wear the safety smock. *Id*. ¶ 8. Berger told plaintiff that he needed to wear the safety clothing and that force would be used if he refused to do so and follow instructions. *Id*. ¶ 9; Complaint at 6. Plaintiff refused to comply and became agitated. *Id*.

At approximately 2:00 am on February 7, 2017, plaintiff began to pull out the sutures in his arms. Complaint at 6. Berger unsuccessfully attempted to persuade plaintiff to stop self-harming. Berger Decl. ¶ 11; Complaint at 6. An emergency cell-extraction team was ready to

---

[1] The Court takes judicial notice of the court order allowing plaintiff to be involuntarily medicated. *See Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007).

intervene by force.  Gaitan Decl. ¶¶ 4-5.

The emergency cell-extraction team consisted of defendants King, Giminez, Castro, Strayhorn and a nonparty correctional officer.  Gaitan Decl. ¶¶ 5-6.  Upon the team's arrival at his cell, plaintiff was standing on top of his bed and bleeding from his arms.  Gaitan Decl. ¶ 6; Castro Decl. ¶ 6; Strayhorn Decl. ¶ 6.  When the team entered plaintiff's cell at approximately 2:04 a.m., plaintiff resisted and fought the team.  Gaitan Decl. ¶ 7-11; King Decl. ¶¶ 6-11; Docket No. 42 at 12, 15; Complaint at 6.  During the altercation, plaintiff removed Castro's safety helmet and began punching his head.  Castro Decl. ¶ 10; Gaitan Decl. ¶ 11; Complaint at 6.  Defendant Dougery entered the cell and sprayed plaintiff in the face with pepper spray.  Complaint at 6.

Plaintiff's and defendants' accounts of the incident diverge at this point.  Plaintiff states that after Dougery pepper-sprayed him, he was tackled, handcuffed and shackled.  He claims the force stopped, the defendants stood up and he stopped resisting.  *Id.*  Plaintiff asserts that it was at this point, when he was not resisting, that defendant Berry walked over and, without saying anything, pepper-sprayed plaintiff in the face while none of the other defendants said anything or intervened.  *Id.*

Defendants dispute this and state that Dougery's pepper spray did not stop plaintiff from punching Castro.  Dougery Decl. ¶ 11; Berry Decl. ¶ 7.  Defendants state that while plaintiff was still actively resisting, Berry instructed plaintiff to place his hands behind his back and, when he did not comply, Berry sprayed him with pepper spray.  Berry Decl. ¶ 8; Dougery Decl. ¶ 12.  Defendants state that only after this second pepper-spraying did plaintiff stop resisting and submit to restraints.  Berry Decl. ¶ 9; Dougery Decl. ¶¶ 13-14.

Plaintiff does not dispute that Berry's pepper spray was a short burst that only lasted one to two seconds.  Berry Decl. ¶ 8; Dougery Decl. ¶ 12, Gaitan Decl. ¶ 15; Complaint at 6-7; Docket No. 42 at 4.

### B. Decontamination and Medical Treatment

A few minutes after being restrained, at approximately 2:06 a.m., plaintiff was taken outside to be in fresh air.  Dougery Decl. ¶ 14; Docket No. 42 at 15; Complaint at 7.  Plaintiff asked to use the hose to wash off but was told by defendants there was no hose.  Complaint at 7.

3

He was injected at approximately 2:09 a.m. with a combination of medications that Berger ordered to treat plaintiff's agitation and mental disorder. Berger Decl. ¶¶ 12-14; Docket No. 42 at 15; Complaint at 7. Berger was aware of the court order allowing the involuntary administration of psychotropic medication. Berger Decl. ¶ 12. Even without the court order, Berger felt the involuntary medication was necessary because plaintiff was experiencing a psychiatric emergency and was at imminent risk of serious self-harm. *Id*. ¶¶ 12, 18.

Plaintiff was put in a wheelchair and taken to a shower at approximately 2:15 a.m. Gaitan Decl. ¶ 22; Docket No. 42 at 15; Complaint at 7. Plaintiff was in the shower for a few minutes when he asked to leave because the water had only one temperature and it was too warm. Gaitan Decl. ¶ 21; Docket No. 42 at 15; Complaint at 7. Plaintiff was then taken to an eyewash station at approximately 2:25 a.m. Gaitan Decl. ¶ 22; Docket No. 42 at 15; Complaint at 7. By then, plaintiff could see again and was experiencing much less pain. Complaint at 7. At approximately 2:31 a.m., plaintiff was taken to a bath where a nurse rinsed him off with cold water. Docket No. 42 at 15; Complaint at 8. At approximately 2:40 a.m., plaintiff was taken to an exam room where his wounds were treated. Docket No. 42 at 16; Complaint at 8.

Plaintiff was then escorted to a room where he was placed on a bed and restrained with four-point restraints. Complaint at 8. Parts of his body still burned from the pepper spray. *Id*. Berger spoke to plaintiff, who denied any intent to self-harm. Berger Decl. ¶ 17. Plaintiff was then escorted back to his cell and provided a safety smock, a safety blanket and a safety mattress. *Id*.

### C. Administrative Exhaustion.

The California Department of Corrections and Rehabilitation ("CDCR") provides an administrative appeals process, in accordance with Title 15 of the California Code of Regulations, that permits an inmate to appeal any departmental decision, action, condition, or policy that has a material adverse effect on the inmate's health, safety, or welfare. Cal. Code Regs. tit. 15, § 3084.1(a). To resolve their issues through the administrative appeals process, inmates must submit a CDCR 602 Form, commonly referred to as an appeal form, describing the issue and action requested. Cal. Code Regs. tit. 15, § 3084.2(a).

The inmate appeal process consists of three levels of appeal: (1) first-level appeal, (2) second-level appeal to the institution head or designee, and (3) third-level appeal to the Secretary of CDCR. Cal. Code Regs. tit. 15, § 3084.7. First- and second-level appeals are handled by staff located at the respective institutions, while third-level non-medical appeals are received and decided by CDCR staff at the Office of Appeals. MSJ, Liu Decl. ¶ 4. A substantive decision on an appeal at the third level exhausts CDCR's administrative remedies. *Id*. at ¶ 3.

Plaintiff was still under a court order for involuntary medication at the time of the cell extraction. Docket No. 38 at 5. Plaintiff made several requests for staff assistance to file a complaint. *Id*. at 5-6. He states that he received no assistance. *Id*. The medical notes for plaintiff's care indicate that he requested to speak to the patient advocate on February 13, 2017. *Id*. at 104. As of February 14, 2017, plaintiff was taking the following psychiatric medications: Bupropion, Clonzaepam, Diphenhydramine, Gabapentin, Olantzapine and Lorazepam. *Id*. at 101. Plaintiff's medical notes indicate that on February 15, 2017, in order to advocate for himself, he requested access to a phone, pen and paper. *Id*. at 100. It is unclear if staff granted these requests. *Id*. On February 17, 2017, plaintiff was talking to the warden about the use of force incident. *Id*. at 105. Plaintiff's medical notes indicate that he asked to see the patient advocate on February 21, 2017. *Id*. at 99. Plaintiff states he was unable to obtain an inmate appeal form. *Id*. at 6. Plaintiff finally obtained an inmate appeal form and gave it to his attorney to send to the appeals office. *Id*. at 7.

Defendants dispute many of plaintiff's assertions and note that inmate appeal forms are available from any CDCR staff member. Reply, Andres Decl. ¶¶ 5-7. Plaintiff filed other appeals while in PIP, including on October 28, 2014, and June 26, 2017. MSJ, Liu Decl. Ex. A.

On March 28, 2017, the SQSP appeals office received appeal number SQ-C-17-00795 regarding a cell extraction during which plaintiff was mistreated, pepper-sprayed and not given proper medical care. Docket No. 36, Andres Decl. ¶ 9. Plaintiff did not specify the date of the incident. *Id*. Ex. B. On April 10, 2017, this appeal was cancelled at the first level of review because it was not submitted before the 30 calendar day deadline. *Id*. ¶ 9, Ex. B. The cancellation notice informed plaintiff that he could not resubmit the appeal but could file a separate appeal

1    regarding the cancellation decision. *Id*. Ex. B.

2       Plaintiff filed a separate appeal regarding the cancellation of the above appeal, which was
3    received by the appeals office on May 2, 2017. *Id*. ¶ 10. This was appeal number SQ-C-17-
4    01161. *Id*. Plaintiff argued in this appeal that he was involuntarily housed in the PIP; was being
5    involuntarily medicated; was on suicide watch; and, due to his poor mental health status and lack
6    of staff assistance, was unable to comply with the deadline for filing an appeal. *Id*. Ex. C. On
7    May 11, 2017, appeal SQ-C-17-01161 was granted at the second level because, due to his mental
8    state and heavy medication, he required assistance to understand and comply with the appeal-
9    system rules for appeal number SQ-C-17-00795. *Id*. On June 15, 2017, the granted second-level
10   appeal was reversed because it was determined that plaintiff did understand the appeals process
11   but failed to meet the deadline. *Id*. ¶ 10. The reversal noted that plaintiff properly filed the appeal
12   and should therefore have understood earlier the process to file the original appeal. *Id*. Ex. C.
13   This appeal was completely exhausted at the third and final level on September 18, 2017. MSJ,
14   Liu Decl. ¶ 9; Ex. B. It was found at the third level that plaintiff had never contacted the appeal
15   coordinator to request assistance. *Id*. Ex. B.

### III.  DISCUSSION

#### A. Motion for Summary Judgment

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial

burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)). The nonmoving party must show more than "the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby,* 477 U.S. at 252). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id.* at 323.

At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). When, however, "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). As noted, plaintiff has filed an opposition to defendants' motion for summary judgment. Docket Nos. 38, 42, 44.[2] These filings are verified and signed under penalty of perjury, so will be considered by the Court. In addition, because the

---

[2] Defendants' motion to strike the extra replies is denied in light of plaintiff's status as an incarcerated pro se litigant. *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). Furthermore, plaintiff sought an extension or stay to file an additional opposition. Docket No. 38. The Court deems the extra replies timely filed.

complaint is verified, the Court will also construe it as an opposing affidavit under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

### B. Exhaustion

"The PLRA [Prison Litigation Reform Act] mandates that inmates exhaust all available administrative remedies before filing 'any suit challenging prison conditions,' including, but not limited to, suits under § 1983." *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). To the extent that the evidence in the record permits, the appropriate procedural device for pretrial determination of whether administrative remedies have been exhausted under the PLRA is a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Id*. at 1168. The burden is on the defendant to prove that there was an available administrative remedy that the plaintiff failed to exhaust. *Id*. at 1172. If the defendant meets that burden, the burden shifts to the prisoner to present evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. *Id*. The ultimate burden of proof remains with the defendant, however. *Id*. If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. *Id*. at 1166. But if material facts are disputed, summary judgment should be denied and the district judge rather than a jury should determine the facts in a preliminary proceeding. *Id*.

An inmate "need not exhaust unavailable [remedies]." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). An administrative remedy is unavailable "when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use, [i.e.,] some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate [the mechanism]"; or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1859–60.

8

In this case defendants demonstrated that there was an available administrative remedy that plaintiff failed to exhaust. But plaintiff has presented evidence and the undisputed facts show that there is something in this particular case that made the administrative remedies effectively unavailable to him. The ultimate burden of proof lies with defendants to demonstrate that plaintiff failed to exhaust administrative remedies. Defendants have not met that burden.

It is undisputed that the incident at issue occurred on February 7, 2017, and that plaintiff had 30 calendar days to file his appeal. Plaintiff submitted the appeal on March 22, 2017, and it was received by the appeals office six days later. After this appeal was cancelled for being untimely, plaintiff appealed the cancellation and argued that he was involuntarily housed in the PIP; was being involuntarily medicated; was on suicide watch; and, due to his poor mental health status and lack of staff assistance, was unable to comply with the time constraints. This appeal was originally granted, finding that in light of plaintiff's mental health needs and forcible medication he needed assistance to comply with the appeals-system rules. This decision was later reversed because the inmate appeals office found that because plaintiff was able to properly file the second appeal challenging the cancellation, he should have been able to properly file the first appeal. This decision to reverse the granted appeal raises several questions.

It does not follow that because plaintiff was able to properly file an appeal regarding his cancellation letter, he must have been able to timely file the original appeal. Defendants' argument fails to take into account the specific circumstances here in light of plaintiff's mental health status. Plaintiff has presented substantial evidence, which is undisputed, that he repeatedly sought assistance to appeal the incident. Docket No. 38 at 5-6. He requested writing materials and repeatedly requested to speak with the patient advocate. *Id*. at 99-100, 104. These actions demonstrate that plaintiff was attempting to promptly file his inmate appeal. It is also undisputed that plaintiff was in the PIP on suicide watch while being forcibly medicated with many different medications. The medical records support his assertions that due to his poor mental health status he needed assistance.

Defendants note that plaintiff has experience with the appeals system and exhausted

appeals in October 2014 and in June 2017. While this is a valid point, it fails to address plaintiff's mental state during the relevant time in February 2017, following his self-harm and in light of his regimen of heavy, forced medication.

Defendants also present evidence that, generally, inmate appeal forms are available from any CDCR staff member, even in PIP. The third-level response to plaintiff's appeal also noted that plaintiff never sought assistance. While the court assumes that the forms are available, Defendants present no evidence to show that the forms were available to plaintiff in February 2017 when he was on suicide watch and heavily medicated. It is undisputed that plaintiff sought help from medical staff to proceed with his complaint regarding the cell extraction. Medical staff noted his repeated requests for assistance. While the Court assumes that the appeals coordinator did not learn of plaintiff's requests for help, it is undisputed that plaintiff did seek help while confined on suicide watch and being heavily medicated. The Court will not find that plaintiff failed to exhaust administrative remedies because his requests to medical staff, which were documented in the medical reports, did not reach the appropriate personnel. Plaintiff has met his burden of showing that there was something in this particular case that made the existing and generally available administrative remedies effectively unavailable to him. *See Albino* at 1172; *Anderson v. Hernandez*, No. 15-cv-993 BEN (BLM), 2016 WL 11448148, at *18-19 (S.D. Cal. June 20, 2016) (defendants unable to carry burden of exhaustion in light of plaintiff's sworn declaration and verified complaint indicating he was on suicide watch, was moved to a crisis bed and was mentally incapable of filing an appeal).

Defendants also argue that even if plaintiff's appeal regarding the cell extraction was fully exhausted, it did not contain enough information. Where a prison's grievance procedures do not specify the level of factual specificity required in the grievance, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). The purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation. *Id.* The grievance should include sufficient information "to allow prison officials to take appropriate responsive measures." *Id.* at 1121 (internal quotation omitted).

1    The appeal at issue did not provide the date the incident occurred or identify the individual
2    defendants.  Other than missing those facts, the appeal was quite detailed in presenting the facts
3    and alerting prison officials to the nature of the wrong.  While plaintiff did not include the date,
4    prison officials quickly ascertained the date and were able to deny the appeal as untimely.[3]  For all
5    these reasons, and in light of the specific circumstances in this case and plaintiff's documented
6    mental health issues, defendants have failed to meet their burden of showing that plaintiff failed to
7    exhaust.

### C. Statute of Limitations

Section 1983 does not contain its own limitations period.  The appropriate period is that of the forum state's statute of limitations for personal injury torts.  *See Wilson v. Garcia*, 471 U.S. 261, 276 (1985), *superseded by statute on other grounds as stated in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 377-78 (2004); *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).  In California, the general residual statute of limitations for personal injury actions is the two-year period set forth at section 335.1 of the California Civil Procedure Code, and this is the applicable state statute in § 1983 actions.[4]  The statute of limitations is tolled for the time it takes for a prisoner to administratively exhaust his underlying grievances.  *See Brown v. Valoff*, 422 F.3d 926, 942-43 (9th Cir. 2005) ("the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process").

The incident in this case occurred on February 7, 2017.  Plaintiff filed this case on April 4, 2019.  Docket No. 1 at 16.  The two-year statute of limitations expired approximately on February 7, 2019, two months before plaintiff filed this case.  However, as noted above, plaintiff met his

---

[3] Defendants also argue that plaintiff's appeal was insufficient because California regulations require that the appeal name "all staff member(s) involved" and "describe their involvement in the issue." Cal. Code Regs. tit. 15, § 3084.2(a)(3).  While this would normally be fatal to plaintiff's case, in light of plaintiff's mental health status and heavy medication, the Court finds it clear that the assistance necessary for him to file a compliant appeal was unavailable to him at the relevant time, for the same reasons discussed above.

[4] California Civil Procedure Code section 352.1 recognizes imprisonment as a disability that tolls the statute of limitations when a person is "imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term of less than for life." Cal. Civ. Proc. Code § 352.1(a). The tolling is not indefinite, however; the disability of imprisonment delays the accrual of the cause of action for a maximum of two years.  *See id.*  Plaintiff is not entitled to this tolling because he is sentenced to death, which is not a term of less than life.

11

burden in showing that there was something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. It is undisputed that plaintiff filed two different appeals related to this case and spent more than four months exhausting both appeals. Because the statute of limitations must be tolled while a prisoner completes the exhaustion process, this case is timely.

### D. Excessive Force

The treatment a convicted prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (omission in original) (internal quotation marks and citation omitted). A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, i.e., the offending conduct was wanton, *id*. (citing *Wilson*, 501 U.S. at 297).

The objective component of an Eighth Amendment excessive force claim does not have a "categorical standard," but rather is "contextual and responsive to contemporary standards of decency." *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). A prisoner "must objectively show that he was deprived of something sufficiently serious . . . but what constitutes a sufficiently serious deprivation may evolve as the basic mores of society change." *Id*. at 1141 (internal quotation marks and citations omitted).

In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7.

To establish a failure to protect claim, the prisoner must establish that prison officials were deliberately indifferent to a sufficiently serious threat to the prisoner's safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "'Deliberate indifference' has both subjective and objective components." *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013). The prisoner must show that "the official [knew] of and disregard[ed] an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Farmer*, 511 U.S. at 837. "Liability may follow only if a prison official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Labatad*, 714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847).

A prison official may be liable under 42 U.S.C. § 1983 if he is aware that a fellow officer is violating a prisoner's constitutional rights but fails to intervene. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) ("[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."). The failure to intervene can support an excessive force claim where the bystander-officers had a realistic opportunity to intervene but failed to do so. *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003); *Cunningham*, 229 F.3d at 1289.

Plaintiff argues that Berry used excessive force when she pepper-sprayed him without warning at a time when he was no longer resisting and had been subdued (after the first pepper spray). He argues that the other defendant guards are liable for failing to protect him from Berry. Plaintiff does not argue that the original actions involving the cell extraction team and the first use of pepper spray violated his rights. Complaint at 10-11; Docket No. 42 at 1, 4, 12. Even if he did present these actions as a claim, he would not be entitled to relief. Plaintiff admits that when defendants entered his cell he was pulling out his sutures and refused to stop; he was bleeding from his arms; and he fought the defendants including by removing one guard's helmet and repeatedly striking him in his head. Defendants did not use excessive force in attempting to restrain plaintiff, who was self-harming and actively resisting.

With respect to defendant Berry and the second use of pepper spray, defendants argue that

1    plaintiff was still actively resisting and ignoring instructions to place his hands behind his back to
2    be handcuffed at the time Berry pepper-sprayed him.  Only then did he stop resisting and submit
3    to restraints, according to defendants.  If these facts are accurate, then no constitutional violation
4    occurred for the second pepper spraying.

5    However, plaintiff states that after the first use of pepper spray he was taken to the ground,
6    handcuffed and shackled, and the force stopped.  He states that defendants stood up and he
7    stopped resisting.  He alleges that it was at that point, while he was not resisting and without
8    warning, that defendant Berry walked over and pepper-sprayed him in the face.

9    With respect to Berry and the second use pepper spray, material facts remain in dispute
10   regarding the incident, and the case will hinge on whether plaintiff's version of the facts or
11   defendants' version is accurate.  The law in this Circuit is clear that the use of chemical agents in
12   quantities greater than necessary to restore order or for the sole purpose of infliction of pain
13   violates the Eighth Amendment.  *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013).
14   Viewing the evidence in the light most favorable to plaintiff, he has met his burden and a jury
15   could conclude there was an Eighth Amendment violation.  Because there are disputed facts,
16   plaintiff's motion for summary judgment is denied as to defendant Berry.

17   With respect to the allegations that the remaining guards failed to protect plaintiff from
18   Berry's pepper spraying, defendants' have met their burden in demonstrating the absence of a
19   genuine issue of material fact.  Assuming plaintiff's version of the facts is true, then Berry walked
20   in and pepper-sprayed him without any warning.  It is undisputed that the pepper-spraying only
21   lasted for one to two seconds.  There was no time or reasonable opportunity for the other
22   defendants to have intervened, and there are no allegations that they could have foreseen the
23   second pepper-spraying.  *See Lolli*, 351 at 418; *Hamilton v. White*, 586 F. App'x 416 (9th Cir.
24   2014) (summary judgment was properly granted for defendant guards who did not use force
25   against the prisoner and could not have reasonably interfered or foreseen the use of pepper spray
26   by a different guard).  Summary judgment is granted on the failure to protect claim as to Dougery,
27   Gaitan, Castro, Giminez, Strayhorn and King.  To the extent that plaintiff argues Dr. Berger failed
28   to protect him by allowing the cell extraction, summary judgment is granted to Dr. Berger.

Plaintiff was ripping out his sutures, bleeding from his arms, and would not stop his actions. Dr. Berger did not fail to protect plaintiff by having him removed from the cell so that his mental health issues could be addressed and his wounds treated.

Summary judgment is also granted to Dr. Berger with respect to the claim that he used excessive force in having other staff inject plaintiff with drugs after plaintiff was extracted from the cell. It is undisputed that earlier in the evening plaintiff had attempted to commit suicide; that just prior to the cell extraction, plaintiff was suicidal and ripping out his sutures; and that there was a court order allowing plaintiff to be involuntarily medicated. Dr. Berger has met his burden in demonstrating the absence of a genuine issue of material fact. Plaintiff has failed to meet his burden of showing a triable claim that his Eighth Amendment rights were violated. Plaintiff has not shown that there was a serious deprivation or that Dr. Berger possessed a culpable state of mind. The injection given to plaintiff, who was having a mental health episode, was required to calm him, and it is undisputed that plaintiff later calmed down. Summary judgment is granted for Dr. Berger.

### F. Medical Treatment

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. Id. at 1059.

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment. *Id.* at 1059-60.

A prison official is deliberately indifferent if he or she knows that a prisoner faces a

15

substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but also "must also draw the inference." *Id.* If a prison official should have been aware of the risk, but did not actually know, the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). In addition "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference. . . . [Prisoner] would have no claim for deliberate medical indifference unless the denial was harmful." *Shapely v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

Plaintiff argues that defendants were deliberately indifferent to his serious medical needs by delaying his opportunity to decontaminate from the pepper spray. Plaintiff's argument is contradicted by the undisputed facts, many of which are found in his complaint and opposition. It is undisputed that plaintiff was taken outside for fresh air just a few minutes after the pepper-spraying. He was then taken to a shower by a wheelchair approximately 10 minutes after he was taken outside. Ten minutes after he was taken to the shower, plaintiff was taken to an eye-wash station. Approximately six minutes later, he was taken to a bath.

Plaintiff has not shown that defendants were deliberately indifferent to his serious medical needs by immediately taking him outside and then quickly taking him to a shower, eye station and bathtub. The entire process took about thirty minutes. This does not demonstrate a constitutional violation. To the extent plaintiff argues that there was a delay, a mere delay with no other injury does not violate the Eighth Amendment. Defendants are entitled to summary judgment because plaintiff's allegations fail to rise the high level of deliberate indifference.

### G. Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194,

200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether an officer is entitled to qualified immunity, the court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

With respect to the second prong of the qualified immunity analysis, the Supreme Court has held that "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original) (internal quotation marks omitted). This is an "exacting standard," which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who

17

knowingly violate the law." *Id.* (internal quotation marks omitted).  In conducting this analysis, the Court must determine whether the pre-existing law provided defendants with "fair notice" that their conduct was unlawful.  *Id.* at 1777.

With respect to Berger and the second use of pepper spray, plaintiff has adequately alleged a violation of a clearly established constitutional right, in that a reasonable person in Berger's position in 2017 would not have believed that it was lawful to pepper-spray plaintiff when he was complying with commands, not resisting and had already been shackled.  *See Furnace*, 705 F.3d at 1028.  The Court must view the evidence in the light most favorable to Plaintiff.  *See Tolan*, 570 U.S. at 656-57.  Berger is therefore not entitled to qualified immunity.[5]

## IV.     REFERRAL TO PRO SE PRISONER MEDIATION PROGRAM

This case appears to be a good candidate for the court's mediation program.  Good cause appearing therefore, this case is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the Pro Se Prisoner Mediation Program.  The proceedings will take place within 120 days of the date this order is filed.  Magistrate Judge Illman will coordinate a time and date for mediation or settlement proceedings with all interested parties and/or their representatives and, within five days after the conclusion of the proceedings, file with the Court a report on those proceedings.

Plaintiff must attend and participate in the mediation or settlement conference proceedings.  The conference may be set up so that he will appear in person, by videoconference, or by telephone; plaintiff must attend via whatever format Magistrate Judge Illman chooses.  Plaintiff is cautioned that he may be sanctioned for failure to comply with an order to participate in a mediation or settlement conference, and such sanctions may include dismissal of part or all of the action.  *See* Fed. R. Civ. P. 16(a), (f), and 41(b).

## V.     CONCLUSION

For the foregoing reasons, the Court orders as follows:

---

[5] Because the Court found no triable issue of fact regarding a constitutional violation by any defendant other than Berger, the Court need not address whether qualified immunity could extend to any of the other defendants.

18

1. Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Docket. No. 35. All defendants and claims are dismissed except for the excessive force claim against defendant Berry.

2. Defendants' motion to strike plaintiff's sur-replies is DENIED. Docket No. 45. The Court has reviewed the filings.

3. This action is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the Pro Se Prisoner Mediation Program. The Clerk shall send a copy of this order to Magistrate Judge Illman.

4. This order terminates Docket Nos. 35, 45

**IT IS SO ORDERED.**

Dated: 9/30/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge